******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* YONG SIK KIM
## (SC 21086)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of sexual assault in the third degree and assault of an elderly person in the third degree in connection with the assault of a coworker, the defendant appealed. The incident giving rise to the defendant's conviction occurred outside of work hours, at the victim's condominium, after the victim had invited the defendant over to assist her with certain home repairs. Shortly after the assault, the victim reported the incident to the company that employed the victim and the defendant, and the company's human resources manager, S, and plant manager, A, then interviewed the defendant. During that interview, the defendant initially denied having been at the victim's condominium when the assault allegedly took place. At trial, the defendant testified in his own defense and admitted on direct examination that he was not entirely truthful during his interview with S and A. The defendant specifically testified that it was the victim who had made advances toward him and that he was not entirely truthful during that interview because of a promise to the victim not to tell anyone about the incident. On cross-examination, however, the defendant testified that he had never denied going to the victim's condominium. At the prosecutor's request, and over defense counsel's objection, the trial court instructed the jury on consciousness of guilt, determining that such an instruction was warranted because of the defendant's purportedly conflicting statements regarding his presence at the victim's condominium on the date of the assault. The court specifically instructed the jury in relevant part that that the state had presented evidence that the defendant initially informed S and A that he never went to the victim's condominium on the date in question, "only to change his story" by later admitting that he had gone there on that date. On appeal, the defendant claimed that the trial court had improperly instructed the jury on consciousness of guilt and that this court should invoke its supervisory authority to reverse his conviction and to preclude courts from instructing juries on consciousness of guilt. *Held*:

The trial court abused its discretion by instructing the jury in the present case on consciousness of guilt, but the error was nevertheless harmless.

Although the court instructed the jury that the defendant had "change[d] his story" regarding his presence at the victim's condominium on the date in question, the evidence adduced at trial was unclear as to whether the defendant had actually made any inconsistent statement and unclear as to the circumstances pursuant to which any such statement had been made.

Moreover, the inferential link to consciousness of guilt was attenuated, the probative value of the evidence concerning consciousness of guilt was minimal, and the court's singling out that evidence presented a risk of unduly

magnifying its probative value or suggesting that it warranted closer scrutiny than other evidence.

Furthermore, the trial court compounded matters by failing to provide a balanced, neutral instruction and by instead adopting the state's characterization of the evidence, as the use of the phrase "change[d] his story" carried a distinctly pejorative connotation suggesting the defendant's lack or credibility or an attempt to mislead.

Nevertheless, this court concluded that the trial court's instructional error was harmless, as it was not reasonably probable that the jury was misled by the trial court's consciousness of guilt instruction.

Several features of the court's instruction mitigated the impact of the court's error in giving the instruction and its characterization of the evidence.

Specifically, the court delivered comprehensive instructions on circumstantial evidence and witness credibility, and reminded the jury that the drawing of inferences from a witness' conduct was entirely within its province.

Moreover, the court's instruction on consciousness of guilt contained an important limiting caveat, namely, that the jury could draw an inference of consciousness of guilt only if it first found that the evidence established the relevant conduct and that such conduct was influenced by the criminal act or acts and not by any other reason.

Furthermore, the evidence of the defendant's guilt was strong and included corroborating physical evidence that independently supported the victim's account of the incident.

In addition, the jury found the defendant not guilty on several other charges, which made it less likely that the jury mechanically translated the trial court's characterization of the evidence into a blanket finding of guilt.

This court denied the defendant's invitation to invoke its supervisory authority to direct Connecticut courts to abandon the use of consciousness of guilt instructions altogether and to reverse his conviction.

After reviewing the history and criticisms of the consciousness of guilt instruction in Connecticut courts and in other jurisdictions, this court determined that the exercise of its supervisory authority to abandon the use of such an instruction was not warranted, the court having reasoned that the decision whether to provide such an instruction rests within the sound discretion of a trial court, that a trial court is uniquely situated to determine whether the evidence supports the instruction and whether it will aid rather than confuse the fact finder, and that this gatekeeping function, along with the availability of appellate review, provided important safeguards against the unwarranted or unfair use of the instruction.

Moreover, although the state is the party that most often asks for the instruction, there are circumstances in which the defense might prefer that it be given to cabin the force of the prosecutor's argument by reminding the fact

finder that the consciousness of guilt evidence does not necessarily reflect or create a presumption of guilt and must be evaluated with caution.

Furthermore, considerations of stare decisis counseled against the categorical elimination of the instruction in Connecticut courts.

However, this court deemed it necessary to invoke its supervisory authority to clarify the limited circumstances in which it is proper to instruct on consciousness of guilt and to identify certain features that such an instruction should and should not include.

The decision to admit consciousness of guilt evidence is distinct from the decision to highlight such evidence through a specific instruction, and a trial court, in exercising its discretion, should undertake a careful, case-specific assessment concerning whether a specific instruction is warranted and, if so, the appropriate form it should take.

When a prosecutor requests a consciousness of guilt instruction over the defense's objection, a trial court should require the prosecutor to explain why the instruction is necessary, including why the fact finder cannot, despite the court's general instructions on circumstantial evidence and reasonable inferences, be expected to evaluate the consciousness of guilt evidence and to draw appropriate inferences without the court's express guidance.

When the defense requests a consciousness of guilt instruction or does not object to one, the instruction may serve a protective function, and there is no reason for the trial court not to give it.

If a trial court determines that a consciousness of guilt instruction is warranted, it should ensure that the instruction is neutral and balanced in order to reduce the risk of any improper influence on the fact finder.

This court declined to rewrite a model consciousness of guilt instruction but observed that the Judicial Branch's model instruction in effect as of the date of this opinion was not entirely balanced.

Accordingly, this court provided guidance for future consciousness of guilt instructions, including recommendations that a trial court convey the position of both the state and the defense as to their respective views about what the evidence regarding consciousness of guilt reflects, include clarifying language advising the fact finder that feelings of guilt do not necessarily reflect actual guilt, indicate that consciousness of guilt evidence, standing alone, is insufficient to prove guilt, eliminate use of the phrase "flight, when unexplained" when a defendant's flight after the crime serves as the basis for the instruction, and avoid using the label or heading "consciousness of guilt" in the instruction delivered orally and in the written charge provided to the fact finder.

(*One justice concurring separately*; *two justices concurring in part and dissenting in part in one opinion*)

Argued February 4—officially released July 28, 2026

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the first degree, sexual assault in the third degree, unlawful restraint in the first degree, assault of an elderly person in the third degree, strangulation in the second degree, and threatening in the second degree, brought to the Superior Court in the judicial district of Danbury and tried to the jury before *Stango, J.*; verdict and judgment of guilty of sexual assault in the third degree and assault of an elderly person in the third degree, from which the defendant appealed. *Affirmed.*

*Jeffrey C. Kestenband*, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *David R. Applegate*, state's attorney, *Tori L. Ludwig*, assistant state's attorney, and *Russell C. Zentner*, senior assistant state's attorney, for the appellee (state).

*Pamela S. Nagy*, supervisory assistant public defender, *John R. Day*, deputy chief public defender, and *Jennifer Bourn*, chief of legal services, filed a brief for the Division of Public Defender Services as amicus curiae.

*Lisa J. Steele* and *Conrad Ost Seifert* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

DANNEHY, J. Following a jury trial, the defendant, Yong Sik Kim, was convicted of assault of an elderly person in the third degree and sexual assault in the third degree, arising from an incident that occurred while he was at a coworker's condominium to assist with home repairs. He laims that the trial court improperly instructed the jury on consciousness of guilt, arguing that the consciousness of guilt evidence lacked sufficient probative value to warrant such an instruction. The defendant further claims that this court should invoke

its supervisory authority to abolish consciousness of guilt instructions altogether, advancing several criticisms of those instructions.[1]

For the reasons that follow, we agree with the defendant that the trial court abused its discretion in giving the consciousness of guilt instruction in this case, but we conclude that the error was harmless. Further, we conclude that the defendant has not demonstrated that the invocation of our supervisory authority is warranted to reverse his conviction and categorically eliminate those instructions. We acknowledge, however, that our prior decisions have not always clearly distinguished between the admissibility of consciousness of guilt evidence and the separate question of when a trial court should instruct the jury specifically on that evidence. In light of that ambiguity, as well as other important considerations discussed in this opinion, we conclude that it is appropriate to invoke our supervisory authority to clarify the limited circumstances in which it is proper to use such instructions and to identify certain features that they should (and should not) include when given. See, e.g., *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002).

I

The jury reasonably could have found the following facts. In July 2018, the victim,[2] who was then sixty years old, and the defendant, then fifty-eight years old, were coworkers and had known each other for approximately

---

[1]The defendant's brief leads with the claim that this court should exercise its supervisory authority to categorically eliminate consciousness of guilt instructions. We elect, however, to address the defendant's specific claim of instructional error first, as resolution of that claim may inform our determination of whether the extraordinary remedy of supervisory intervention is warranted. See, e.g., *State* v. *Castillo*, 165 Conn. App. 703, 730, 140 A.3d 301 (2016), aff'd, 329 Conn. 311, 186 A.3d 672 (2018).

[2]In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

twenty-five years. The victim's husband had died approximately five months earlier, and her adult daughter, who resided in New York, was assisting her in coordinating renovations of her Danbury condominium. Dissatisfied with prior work performed in the unit, the victim asked the defendant to provide an estimate to replace several windows. The defendant occasionally performed side jobs for fellow employees and had previously helped the victim and her husband on at least four separate occasions.

On July 9, 2018, at the victim's request, the defendant went to her condominium to inspect the windows in need of repair. After examining windows in the living room and bedrooms, the defendant closed a bedroom window, turned toward the victim, grabbed her, and then pushed her to the floor. He kissed her and licked her face and body, pulled up her shirt and bra, and licked one of her breasts. The victim resisted. She asked the defendant why he was doing this and attempted to push him away. When she yelled, the defendant threatened to put a rag in her mouth if she continued to resist and placed his hand over her mouth and nose. The defendant then sat on the victim's thighs, continued to hold her down, squeezed her breast and vagina, and kissed her as she pleaded with him to stop. When the victim asked to sit up so that she could breathe, the defendant pulled her up, pushed her on the bed, and pulled down her pants and underwear. The defendant then inserted one finger into her vagina. The victim was afraid and in pain and continued to beg him to stop. When she asked again why he was doing this, the defendant responded that she was a good person, that she was single, and that he thought she needed sex.

The defendant eventually ended the assault and walked toward the door, allowing the victim to pull up her clothing. He stated that he would speak with the condominium manager about the windows. Before leaving, he apologized to the victim, asked for her forgiveness, and requested that she not tell anyone about the incident.

After the defendant left, the victim remembered that she had prearranged dinner plans with her cousin and

aunt that evening. She took a shower and decided to attend that dinner but did not disclose the assault to them because she wished to speak with her daughter first. She later washed the clothing she had worn that day, except for her underwear, which she discarded, and a pair of black pants, which she placed on top of the toilet tank in her bathroom.

The victim returned to work the following day. When a coworker asked about the window repairs, the victim began to cry and referred to the defendant as "a monster," but stated that she could not elaborate any further because the defendant was at work that day and she feared retaliation. The following day, however, she disclosed the details of the assault to her coworker. She also reported the incident to her employer's human resources manager.

Several days later, on July 13, 2018, the victim informed her daughter of the assault. The next day, accompanied by her daughter, she reported the incident to the police. Her daughter provided the police with the black pants the victim had worn on the day of the assault, which had not been washed, as well as the victim's bedsheet. The victim was thereafter examined at a hospital. An emergency medicine physician observed bruising on her left breast, left upper arm, and right knee, as well as possible bruising on her neck. The victim also reported pain in her perineal area and outer vagina. The doctor testified that the bruising was consistent with impacts occurring several days earlier.

On July 26, 2018, Jill Swearingen, the human resources manager for the company where the victim and the defendant worked, and Alexander Ache, the company's plant manager, interviewed the defendant. At trial, the prosecutor asked Swearingen whether she recalled asking the defendant "whether [the defendant] went to an employee's house . . . ." Swearingen responded: "My recollection is that, initially, he indicated that he did not, but, upon asking him further questions, he did reveal that he did go to an employee's house." When

the prosecutor asked Ache whether he recalled Swearingen asking the defendant whether "he had gone to an employee's house," Ache responded: "Yeah, she asked that in the beginning, and his initial response was no, and that was in the context of the work that he was doing with his attorney, but then, later on, we were discussing about a visit to [the victim's] house afterwards." Ache testified that the defendant had told them that he went to the victim's condominium "to help assist with, you know, looking at some windows that needed repair at her house." Swearingen testified that, when asked whether the defendant and the victim had any physical contact on that day, the defendant stated that their shoulders may have touched while inspecting the windows but nothing more.

On August 9, 2018, the defendant, accompanied by counsel, was interviewed by the police. The defendant was arrested and charged with multiple offenses in November 2018.[3] Prior to trial, the state forensic laboratory conducted DNA testing on the victim's black pants as well as her bedsheet. Testing revealed the presence of the defendant's DNA on the exterior hip and waistband of the pants, as well as on the interior front and back panels in the crotch area.[4] The defendant's DNA was not found on the bedsheet.

At trial, the defendant testified in his own defense, acknowledging that he had gone to the victim's condominium but denying that he had assaulted her. According

---

[3]The state charged the defendant in a six count substitute information with (1) sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1); (2) sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A); (3) unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a); (4) assault of an elderly person in the third degree in violation of General Statutes § 53a-61a (a) (1); (5) strangulation in the second degree in violation of General Statutes § 53a-64bb (a); and (6) threatening in the second degree in violation of General Statutes § 53a-62 (a) (1).

[4]The DNA profile from the exterior hip and waistband of the pants revealed a mixture of four contributors, including the victim's DNA, the defendant's DNA, and the DNA of two unknown individuals. The swabs from the interior front and back panels in the crotch area each

to the defendant, after work on July 9, 2018, he went to the victim's condominium at her request to inspect the windows she wanted replaced. When he arrived, the victim had not yet returned home from work, so he waited outside. Once she arrived, the two went inside together; it was a hot summer day and both of them were warm. The defendant testified that he was still sweating from being at work. The victim proceeded to offer him something to drink, which he accepted.

The defendant further testified that, because of the heat, the victim wished to take a shower and asked him to inspect the windows in the meantime. When the victim emerged from the bathroom following her shower, the defendant described her as wearing a black, lingerie style nightgown. She then proceeded to show him the new furniture she had purchased in conjunction with her renovation. The defendant testified that, at some point around that time, he suddenly developed a severe headache, his face became flushed, and he felt what he described as "a lot of pressure in [his] bottom area . . . ." He clarified that he had developed an erection, which he found confusing, as he had not experienced one in a very long time, and that the sensation seemed to him inexplicable. He testified that he was uncomfortable and embarrassed because the victim kept looking at his private parts. He testified that he told the victim he needed to leave and began walking toward the door, at which point the victim came up from behind him and hugged and grabbed him. He testified that, when he turned around, she hugged him again.

The defendant then testified that he was suprised by the victim's advances and pushed her away. He believed the victim must have developed romantic feelings for him. Having no interest in her and feeling angered by her conduct,[5] he told her that she was "ugly," "too old," and that she "had terrible breath . . . ." Seeing that she

revealed a mixture of three contributors, including the victim's DNA, the defendant's DNA, and the DNA of one unknown individual.

[5]The defendant testified that he was in a happy marriage with his wife of thirty-nine years.

was upset and that she might cry, he softened his tone, promising her that he would tell no one about what had occurred. He testified that he left the residence shortly thereafter.

The defendant also was asked about the meeting he had with Swearingen and Ache. When asked whether he had been entirely truthful during that meeting with them, he stated that he had not. He testified that he answered many of their questions honestly, and, although he did not deny being at the victim's condominium, he did not tell them everything because he had promised the victim that he would not disclose that he had rejected her advances. On cross-examination, the prosecutor probed the defendant's omissions to his employer, asking him, among other things, whether he told human resources that the victim had looked at his "privates" while he was there. He indicated that he did not, remarking rhetorically: "How can I tell that to [human resources]?" He reiterated that he did not tell his employer everything because he had promised the victim he would not tell anyone, but clarified that he shared all of the details with the police because he had an obligation to do so.[6]

Following the parties' presentation of evidence, the trial court charged the jury. Although defense counsel objected to a consciousness of guilt instruction, the court concluded that the instruction was warranted, "limited . . . to the one denial by testimony showing that [the defendant] denied at first, to [human resources], having even been at the scene of the alleged crime on the date and time it took place." The court had previously noted on the record that, on direct examination, the defendant attempted to account for his initial lack of candor with human resources, testifying that he had been less than truthful because of a promise he allegedly had made to the victim. The court stated that, on cross-examination, the defendant retreated from that explanation and testified

[6]A video recording and transcript of the defendant's interview with the police were admitted into evidence. The defendant never denied to the police that he was present at the victim's condominium on the day in question.

that he had never denied going to the condominium in the first instance. The court reasoned that this change of testimony made a consciousness of guilt instruction suitable.[7] Following its deliberations, the jury found the defendant guilty of sexual assault in the third degree and assault of an elderly person in the third degree but found him not guilty on all other charges. The court imposed a total effective sentence of five years of imprisonment, suspended after twenty-seven months, followed by fifteen years of probation. This appeal followed.[8]

## II

The defendant seeks reversal of his conviction on the ground that the trial court improperly charged the jury on consciousness of guilt. He argues that the instruction was improper because the consciousness of guilt evidence at trial lacked considerable probative value, especially in light of the innocent explanation he gave for his conduct. He also contends that the court unwittingly took the state's side in its instruction by using certain negative phraseology.[9] We agree that the trial court abused its discretion by giving the instruction under the circumstances of this case.

Consciousness of guilt evidence refers to certain post-crime conduct or statements by an accused—such as fleeing, destroying evidence, making false statements,

[7]In the state's request to charge, the prosecutor sought a consciousness of guilt instruction that directed the jury's attention to purported inconsistencies between the defendant's statements to his employer and those he later made to the police during his interview. The court declined to give the instruction in the form proposed by the state, observing that "the state was looking for a lot with regard to conscious[ness] of guilt."

[8]The defendant appealed from the judgment of conviction to the Appellate Court, and we subsequently granted his motion to transfer the appeal to this court. See General Statutes § 51-199 (c); Practice Book § 65-2.

[9]The state contends that the defendant either waived or failed to preserve his instructional challenge. We disagree. The record reflects that, on multiple days during the trial, including immediately before the court instructed the jury, defense counsel objected to the consciousness of guilt instruction, specifically challenging both the propriety of the instruction and the evidence it intended to highlight. The court noted the objection on the record.

or intimidating witnesses—"[that] may fairly be inferred to have been influenced by the criminal act." (Internal quotation marks omitted.) *State* v. *DePastino*, 228 Conn. 552, 563, 638 A.2d 578 (1994). Although multiple considerations bear on whether a court should instruct on that evidence, an instruction may be given only if there is a reasonable view of the evidence from which the jury could conclude that the defendant's conduct or statements implied a consciousness of guilt. See *State* v. *Scott*, 270 Conn. 92, 105–106, 851 A.2d 291 (2004), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005). "[T]he decision to give a consciousness of guilt instruction is left to the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *McClain*, 324 Conn. 802, 820, 155 A.3d 209 (2017). So long as the instructions are "correct in law, adapted to the issues and sufficient for the guidance of the jury," we will not find the instructions improper. (Internal quotation marks omitted.) *State* v. *Johnson*, 288 Conn. 236, 285, 951 A.2d 1257 (2008).

In the present case, the trial court, over defense counsel's objection, charged the jury on consciousness of guilt. The instruction provided: "Consciousness of guilt. In any criminal trial, it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense, may have been influenced by the criminal act, that is, the conduct or statements show a consciousness of guilt. For example, a person's false statements as to his or her whereabouts at the time of the offense may tend to show a consciousness of guilt.

"In this case, the state presented evidence that the defendant initially told [Swearingen] and [Ache] that he never went to [the victim's] residence on July 9, 2018, only to change his story a short time later by admitting that he had gone to [the victim's] residence on that day. Such a statement does not, however, raise a presumption of guilt.

"If you find the evidence proved, and also find that the acts were influenced by, the criminal act and not by any

other reason, you may, but are not required to, infer from this evidence that the defendant was acting from a guilty [conscience]. It is up to you as judges of the facts to decide whether the defendant's statements, if proved, reflect a consciousness of guilt and to consider such in your deliberations in conformity with these instructions."

Although the defendant's statements to his employer during its internal investigation were relevant and admissible for the jury's consideration, the question presented here is whether the trial court abused its discretion in giving the consciousness of guilt instruction in connection with those statements. We conclude that it did.

The trial court instructed the jury that the state had presented evidence that the defendant initially denied to both Swearingen and Ache that he went to the victim's residence on July 9, 2018, but "change[d] his story" shortly thereafter by admitting that he had done so. Ache's testimony, however, was far less definitive. Although Ache indicated that the defendant initially responded, "no," when asked whether he had gone to an employee's home, Ache testified that the defendant's response arose "in the context of the work that he was doing with his attorney," and that the discussion later turned to a visit to the victim's residence. This testimony leaves uncertain both whether the defendant actually made any inconsistent statement and the circumstances in which any such statement was made.

Even if the evidence were construed more definitively—namely, that the defendant initially denied going to the victim's residence and then, during the same interview, acknowledged that he had done so—the inferential link to consciousness of guilt remains attenuated. Our cases recognizing false statements as probative of consciousness of guilt often involve material misrepresentations made to law enforcement officers in an effort to evade detection or arrest. See, e.g., *State* v. *McClain*, supra, 324 Conn. 816 (consciousness of guilt "instruction typically emphasizes a defendant's false statements to the police"). By contrast, the evidence at issue in the present

case is not so much a false statement as inconsistent statements made in the course of a single interview conducted by the defendant's employer as part of its internal investigation, under circumstances that, as Ache's testimony suggests, may have been shaped by "work that [the defendant] was doing with his attorney . . . ." In these circumstances, when the probative value of the consciousness of guilt evidence is minimal, singling out that evidence through a specific instruction risks unduly magnifying its probative value or suggesting that it warrants closer scrutiny than other evidence.

The trial court's instruction compounded these concerns by failing to provide a balanced, neutral instruction and by adopting the state's characterization of the evidence. Specifically, the court's use of the phrase "change[d] his story" carries a distinctly pejorative connotation, suggesting not merely inconsistency but a lack of credibility or an attempt to mislead. This phrasing risked signaling to the jury that the court endorsed the view that the defendant had made a false statement indicative of guilt, rather than leaving the jury free to assess the evidence and competing inferences on its own. Given the limited probative value of the underlying testimony and the inference in the instruction that favored the state's interpretation, we conclude that the trial court abused its discretion in giving the consciousness of guilt instruction. Instead, the trial court should have simply relied on its general circumstantial evidence and witness credibility instructions and have permitted counsel to argue the significance, if any, of the defendant's statements.[10]

Having concluded that the trial court erred in giving the consciousness of guilt instruction, we must next

---

[10] In concluding that the consciousness of guilt instruction was warranted in the present case, the trial court relied, at least in part, on purported inconsistencies in the defendant's trial testimony. Although the jury was free to draw adverse inferences from the defendant's trial testimony if it found that testimony to be inconsistent or not credible, it does not furnish a proper basis for a consciousness of guilt instruction premised on false, exculpatory, pretrial statements. The proper

determine whether the defendant is entitled to a new trial. We have explained that "[c]onsciousness of guilt claims are not constitutional in nature." (Internal quotation marks omitted.) *State* v. *Cooper*, 353 Conn. 510, 562, 343 A.3d 465 (2025). In circumstances like these, in which the instructional error does not involve a constitutional violation, "the defendant bears the burden of demonstrating that the court's error was harmful." *State* v. *Baltas*, 311 Conn. 786, 822, 91 A.3d 384 (2014). A defendant can establish harm if he can demonstrate that "it is reasonably probable that the jury [was] misled . . . ." (Internal quotation marks omitted.) *State* v. *Adam P.*, 351 Conn. 213, 230, 330 A.3d 73 (2025). In other words, he must show that "it [was] more probable than not that the action of the trial court affected the result." *State* v. *Ali*, 233 Conn. 403, 425, 660 A.2d 337 (1995). In assessing whether an instructional error is harmless, we examine "both the evidence and issues in the case and the charge as a whole." *State* v. *Prioleau*, 235 Conn. 274, 288, 664 A.2d 743 (1995); see also *State* v. *Adam P.*, supra, 233.

Applying that standard, we conclude that the trial court's instructional error was harmless. First, several features of the charge as a whole mitigate the impact of the court's error in giving the instruction and its characterization of the evidence therein. See *State* v. *Campbell*, 328 Conn. 444, 528, 180 A.3d 882 (2018). The trial court delivered comprehensive instructions on circumstantial evidence and witness credibility, and it reminded the jury that the drawing of inferences from

inquiry instead focuses on the defendant's state of mind at the time of the postcrime statement and whether the statement was influenced by the criminal act. Inconsistencies in the defendant's subsequent trial testimony do not bear on that inquiry and cannot therefore supply the basis for the instruction. See, e.g., *United States* v. *Clark*, 45 F.3d 1247, 1251 (8th Cir. 1995) (explaining that consciousness of guilt instruction based on false exculpatory statements is properly aimed at evidence of defendant's pretrial fabrications, not at defendant's trial testimony). Accordingly, to the extent the trial court relied on inconsistencies in the defendant's trial testimony in deciding to give its instruction regarding the defendant's pretrial statements, that reliance was misplaced.

a witness' conduct was entirely within its province. Further, the consciousness of guilt instruction itself contained an important limiting caveat: the jury was told that it could draw an inference of consciousness of guilt only if it first found that the evidence proved the relevant conduct and, further, that such conduct was influenced by the criminal act and not by any other reason. Read as whole, these instructions, together with the uncontested evidence that the defendant never denied to the police that he was at victim's condominium on the day of the assault, provided an appropriate framework within which the jury could assess the significance—or insignificance—of the defendant's statements to his employer, independent of the court's characterization.

Second, the evidence of guilt introduced by the state was strong. See *State* v. *Adam P.*, supra, 351 Conn. 239–40. Unlike many sexual misconduct prosecutions, which turn largely on testimonial credibility, the state presented corroborating physical evidence that independently supported the victim's account. The examining physician observed bruising on the victim and documented her complaints of vaginal pain. The physician further testified that, based on the coloration of the bruises, they were consistent with having been inflicted several days earlier—timing that aligned with the victim's description of the assault. In addition, the defendant's DNA was identified on the interior crotch area of the black pants worn by the victim on the day in question. Taken together, this evidence provided substantial, independent corroboration of the victim's allegations, thereby diminishing the likelihood that the instruction affected the verdict.

Finally, the jury in this case found the defendant not guilty on multiple counts. In light of that verdict, it is less likely that the jury mechanically translated the court's characterization of the evidence into a blanket finding of guilt. Cf. id., 242 ("although there are limits to what inferences we may properly draw from a jury's verdict, the jury's split verdict . . . increases our confidence that the erroneous instruction was harmless"). As such, we

are not persuaded that it was reasonably probable that the jury was misled by the trial court's instruction in this case.

## III

Having concluded that the defendant has not established reversible error, we turn next to the defendant's contention that we should invoke our supervisory authority to abandon all consciousness of guilt instructions in Connecticut and reverse his conviction.

The defendant advances three principal criticisms of the instructions. He contends that **(1)** "[j]urors are likely to give undue weight to a defendant's actions when [a] neutral trial court instructs that the actions may have been motivated by a guilty conscience"; **(2)** "[t]he consciousness of guilt instruction is potentially misleading due to the many possible innocent reasons for the particular conduct"; and **(3)** "[t]he competing inferences to be drawn from the [actions] at issue are inherently argumentative and, thus, more appropriately addressed by the parties in closing arguments."[11] In response, the state disagrees and argues that consciousness of guilt instructions are useful in aiding the jury in the proper use of such evidence. The state also argues that Connecticut has long permitted such instructions and that the principle of stare decisis should give us pause in overruling decades of our precedent. Although we are not persuaded that the exercise of our supervisory authority is warranted to categorically prohibit consciousness of guilt instructions and to reverse the defendant's conviction, we conclude that invocation of that authority is appropriate to clarify their proper use and to identify certain features that they should **(and should not)** include when given.

## A

Criticisms of consciousness of guilt instructions, like the ones advanced by the defendant, stretch back more

[11]Both the Division of Public Defender Services and the Connecticut Criminal Defense Lawyers Association, as amici curiae, similarly support the elimination of consciousness of guilt instructions.

than a century. See, e.g., *Alberty* v. *United States*, 162 U.S. 499, 510–11, 16 S. Ct. 864, 40 L. Ed. 1051 (1896); *Hickory* v. *United States*, 160 U.S. 408, 413, 417, 16 S. Ct. 327, 40 L. Ed. 474 (1896). See generally, e.g., R. Hutchins & D. Slesinger, "Some Observations on the Law of Evidence—Consciousness of Guilt," 77 U. Pa. L. Rev. 725 (1929). In 1896, for example, the defendants in *Hickory* and *Alberty* challenged the trial court's jury instructions regarding their purported flight following the murders with which they were charged, arguing that these instructions gave undue prominence to the evidence of flight and treated them as establishing a presumption of guilt. *Alberty* v. *United States*, supra, 508–10; *Hickory* v. *United States*, supra, 413. In both cases, the trial court had instructed the jury using a biblical passage that stated: "The wicked flee when no man pursueth, but the innocent are as bold as a lion." (Internal quotation marks omitted.) *Hickory* v. *United States*, supra, 416; see also *Alberty* v. *United States*, supra, 509 (virtually identical language). The United States Supreme Court reversed their convictions, reasoning that the instructions given in their cases effectively created a legal presumption of guilt—"so strong and so conclusive that it was the duty of the jury to act on it as axiomatic truth . . . ." *Alberty* v. *United States*, supra, 510; accord *Hickory* v. *United States*, supra, 422.

Since *Hickory* and *Alberty*, defendants in Connecticut have mounted their own challenges to various consciousness of guilt instructions. They have argued that such instructions "[were] not fair because [they] did not recite the possible innocent inferences to be drawn" from their conduct; *State* v. *Groomes*, 232 Conn. 455, 472, 656 A.2d 646 (1995); were "not evenhanded"; id., 473; accord *State* v. *Figueroa*, 257 Conn. 192, 196, 777 A.2d 587 (2001); were "imbalanced"; *State* v. *Silva*, 113 Conn. App. 488, 492, 966 A.2d 798 (2009); or "improperly put the court's imprimatur on the state's version of events . . . ." *State* v. *Coward*, 292 Conn. 296, 314, 972 A.2d 691 (2009); accord *State* v. *Johnson*, supra, 288 Conn. 285. Some defendants urged that the inferences to be drawn from

a defendant's postcrime conduct should be presented through arguments made by counsel, not an instruction by the court. See, e.g., *State* v. *Groomes*, supra, 472.

Despite these criticisms, this court has declined numerous invitations to ban consciousness of guilt instructions. See, e.g., *State* v. *Cooper*, supra, 353 Conn. 563 n.27; *State* v. *Coward*, supra, 292 Conn. 316; *State* v. *Luster*, 279 Conn. 414, 425–26, 902 A.2d 636 (2006); *State* v. *Figueroa*, supra, 257 Conn. 197; *State* v. *Hines*, 243 Conn. 796, 813, 816, 709 A.2d 522 (1998); *State* v. *Groomes*, supra, 232 Conn. 474; see also *State* v. *Carlson*, 226 Conn. App. 514, 546–47, 318 A.3d 283, cert. denied, 350 Conn. 911, 324 A.3d 143 (2024). We have largely upheld the use of those instructions on the basis that "it is [a judge's] duty to inform the jury what the law is as applicable to the facts of the case . . . ." (Internal quotation marks omitted.) *State* v. *Coward*, supra, 316.

Like Connecticut, a majority of jurisdictions permit consciousness of guilt instructions, although the scope, requirements, and formulation of those instructions vary. See, e.g., *People* v. *Frazier*, 16 Cal. 5th 814, 839, 552 P.3d 932, 323 Cal. Rptr. 3d 741 (2024) ("[t]he giving of [a flight] instruction is statutorily required when flight evidence is relied [on] by the prosecution" (internal quotation marks omitted)), cert. denied,      U.S.    , 145 S. Ct. 1186, 221 L. Ed. 2d 264 (2025); *Thompson* v. *State*, 393 Md. 291, 309–10, 901 A.2d 208 (2006) (noting that petitioner's position that flight instruction should be held per se improper "has been adopted by a minority of . . . sister states" and concluding that "the flight instruction may be appropriate under certain circumstances"); *Commonwealth* v. *Steadman*, 489 Mass. 372, 386, 183 N.E.3d 412 (2022) ("[a]n instruction on consciousness of guilt is appropriate where the jury may draw an inference of guilt from evidence of flight, concealment, or similar acts, such as false statements to the police, destruction or concealment of evidence, or bribing or threatening a witness" (internal quotation marks omitted)); *State* v. *Nelson*, 970 N.W.2d 814, 830 (S.D. 2022) (consciousness

of guilt instruction regarding defendant's refusal to take blood test following suspicion of driving under influence was permissible because "[t]he instructions, as a whole, adequately informed the jury as to how [it] could, or could not, consider the evidence of the refusal to consent to the blood draw, the possible inference that could be drawn, and the jury's role in assessing what weight, if any, to afford this evidence"); see also 1 L. Sand et al., Modern Federal Jury Instructions–Criminal (2025) ¶ 6.05, pp. 6-30 through 6-36 (discussing consciousness of guilt instructions in federal courts).

A minority of jurisdictions, however, have limited or barred such instructions in certain contexts, primarily in cases involving a defendant's alleged flight. See, e.g., *Renner* v. *State*, 260 Ga. 515, 518, 397 S.E.2d 683 (1990) ("[although] the state may offer evidence of and argue flight, it shall be error for a trial court in a criminal case to charge the jury on flight"); *State* v. *Wrenn*, 99 Idaho 506, 508, 584 P.2d 1231 (1978) ("[w]e are of the opinion that because of the debatable significance of flight as evidence of guilt, an instruction on flight should not ordinarily be given"); *State* v. *Grant*, 275 S.C. 404, 407, 272 S.E.2d 169 (1980) ("[although] an instruction on flight has been acceptable law for some time in most jurisdictions, we are inclined to think that henceforth it is more appropriate for the judge to decline any charge whatsoever on this issue"); *Hadden* v. *State*, 42 P.3d 495, 508 (Wyo.) ("we hold that hereafter . . . the giving of a flight instruction to the jury, in a criminal case, shall be reversible error"), cert. denied, 537 U.S. 868, 123 S. Ct. 272, 154 L. Ed. 2d 114 (2002).

Relying on his criticisms of consciousness of guilt instructions, the defendant asks us to invoke our supervisory authority to categorically eliminate them and to reverse his conviction. This court has explained that the exercise of our supervisory authority is "an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, [although] not rising to the level of a constitutional violation, is nonetheless of

[the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 215, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). "Generally, cases in which we have invoked our supervisory authority for rule making have fallen into two categories. . . . In the first category are cases wherein we have utilized our supervisory power to articulate a procedural rule as a matter of policy, either as [a] holding or dictum, but without reversing [the underlying judgment] or portions thereof. . . . In the second category are cases wherein we have utilized our supervisory powers to articulate a rule or otherwise take measures necessary to remedy a perceived injustice with respect to a preserved or unpreserved claim on appeal." (Internal quotation marks omitted.) *State* v. *Weatherspoon*, 332 Conn. 531, 552–53, 212 A.3d 208 (2019). In other words, in this second category of cases, we employ our rule-making power and our power to reverse a conviction. See *In re Daniel N.*, 323 Conn. 640, 647–48, 150 A.3d 657 (2016). Because "[c]onstitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system," this court will invoke its supervisory powers to reverse a conviction "only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts." (Internal quotation marks omitted.) *State* v. *Lockhart*, 298 Conn. 537, 576–77, 4 A.3d 1176 (2010).

The defendant has not persuaded us that the exercise of our supervisory authority is warranted to categorically eliminate consciousness of guilt instructions and to reverse his conviction. In Connecticut, consciousness of guilt instructions are not given as of right; the decision whether to provide one rests within the sound discretion of the trial court. See, e.g., *State* v. *McClain*, supra, 324 Conn. 820. Although the defendant argues that there are risks associated with giving such instructions, trial

courts are uniquely situated to determine whether the evidence supports a requested instruction and whether it will aid, rather than confuse, the jury in its deliberations in a particular case. This gatekeeping function, together with the defendant's right to appellate review, provides important safeguards against the unwarranted or unfair use of the instruction. Although we recognize that the trial court erred in the present case, we have also determined that error was harmless.

Moreover, although it is more often the state that requests a consciousness of guilt instruction, there are circumstances in which the defendant may prefer that the court give one. A defendant reasonably may conclude that, if the prosecutor is going to argue consciousness of guilt to the jury, a neutral and carefully worded instruction from the court, explaining the limited significance of the evidence or that there may be innocent explanations for the defendant's conduct, may temper the rhetorical effect of that line of argument.[12] In such cases, the instruction can serve to cabin the force of the prosecutor's argument by reminding the jury that the conduct does not necessarily reflect, or create a presumption of, guilt and must be evaluated with caution. These considerations weigh against the defendant's proposed categorical elimination of the instructions.[13]

The stare decisis considerations raised by the state likewise counsel against exercising our supervisory

---

[12]When a defendant requests such an instruction, the trial court should, in most circumstances, grant such a request, even if the request comes after the completion of closing arguments. See part III B of this opinion.

[13]The defendant also draws on this court's decision in *State* v. *Malave*, 250 Conn. 722, 728, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000), which abolished the missing witness instruction, arguing that several of the reasons animating that decision apply with equal force to consciousness of guilt instructions and counsel for their elimination. Although certain aspects of the analysis in *Malave* bear some conceptual relevance—particularly its discussion of the propriety of drawing certain inferences from specific categories of evidence—the circumstances underlying that decision differ in important respects from those presented here, rendering it of

authority to categorically eliminate such instructions and to reverse the defendant's conviction. Although the question of whether this court should exercise its supervisory authority and the question of whether it should overrule its precedent under principles of stare decisis are analytically distinct, the two inquiries often converge when a party asks the court to invoke its supervisory authority in a manner that would require it to overrule its precedent. See, e.g., *State* v. *Coward*, supra, 292 Conn. 316 ("[t]he defendant has not presented us with a compelling reason to deviate from those conclusions and, accordingly, we decline his invitation to exercise our supervisory powers in the circumstances of the present case"). In the present case, the defendant asks us to overrule decades of precedent permitting consciousness of guilt instructions and thereby reverse his conviction, but essentially advances the same arguments that this court has previously considered and rejected when addressing similar requests to abandon the instruction. See, e.g., id., 314; *State* v. *Groomes*, supra, 232 Conn. 472. Simply put, the defendant has not presented the kind of compelling reasons necessary to categorically eliminate consciousness of guilt instructions and to reverse his conviction.

B

Although we decline the defendant's invitation to abandon consciousness of guilt instructions altogether, we conclude that this case presents an appropriate opportunity to articulate procedural rules for future cases. The arguments advanced by the defendant and the amici

limited value. See id., 735–38. Specifically, in *Malave*, this court did not merely discontinue the use of the adverse inference instruction; it abrogated the underlying evidentiary principle itself, commonly referred to as the *Secondino* rule. Id., 738–39; see *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 675, 165 A.2d 598 (1960). The elimination of the instruction thus followed naturally from the elimination of the rule that authorized the inference in the first place. In the present case, however, evidence of consciousness of guilt, which forms the basis for the corresponding jury instruction, remains admissible. Accordingly, the doctrinal foundation for such instructions has not been undermined in the same manner as the adverse inference rule at issue in *Malave*, and the analogy the defendant seeks to draw is therefore inapt.

curiae, the Division of Public Defender Services and the Connecticut Criminal Defense Lawyers Association (CCDLA), together with an examination of our precedent, reveal that our cases involving consciousness of guilt have not clearly distinguished between the admissibility of consciousness of guilt evidence and the separate question of whether a trial court should instruct the jury on that evidence. Our cases instead have generally upheld such instructions when admissible evidence of consciousness of guilt was presented at trial, suggesting that admissibility is the dispositive factor for giving such an instruction. See, e.g., *State* v. *Scott*, supra, 270 Conn. 105–106. There can be little dispute, however, that the considerations governing whether a trial court should specifically instruct the jury on particular evidence differ from those governing whether the court should admit that evidence in the first place. In light of this ambiguity in our case law, which presents the risk of trial courts giving such instructions in circumstances that may be unfair to defendants, the limited guidance that we have provided regarding these instructions, and the repeated and varied challenges to these instructions that have come before this court over the past several decades, we conclude that it is appropriate to invoke our supervisory authority to clarify the proper use of consciousness of guilt instructions and to identify certain features that such instructions should and should not include. See, e.g., *State* v. *Elson*, 311 Conn. 726, 764, 91 A.3d 862 (2014) ("[i]t is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice" (internal quotation marks omitted)).

Some background is warranted. Connecticut courts have long permitted the admission of consciousness of guilt evidence. See, e.g., *State* v. *Ford*, 109 Conn. 490, 496, 146 A. 828 (1929); *State* v. *Cronin*, 64 Conn. 293, 305, 29 A. 536 (1894). Consciousness of guilt evidence is circumstantial evidence that can be indicative of guilt itself. See *State* v. *Groomes*, supra, 232 Conn. 472. Although it "is a species of evidence that should be viewed with caution [and] it should not be admitted

mechanically"; (internal quotation marks omitted) *State* v. *Jones*, 234 Conn. 324, 356, 662 A.2d 1199 (1995); it is generally admissible if there is a view of the evidence that would support a reasonable inference that the defendant's postcrime conduct or statements were influenced by the criminal act. See, e.g., *State* v. *DeMatteo*, 186 Conn. 696, 702, 443 A.2d 915 (1982) ("[a] misstatement of a suspect to police officers is admissible against him in a later prosecution because it permits the jury to draw the reasonable inference that the misstatement was made in an attempt to avoid detection for the crime"). Of course, to be admissible, the probative value of the consciousness of guilt evidence must outweigh its prejudicial effect. *State* v. *Hill*, 307 Conn. 689, 698, 59 A.3d 196 (2013).

We have explained that the fact that the evidence may support an innocent explanation as well as an inference of consciousness of guilt does not render its admission erroneous. E.g., *State* v. *Gonzalez*, 315 Conn. 564, 593–94, 109 A.3d 453, cert. denied, 577 U.S. 843, 136 S. Ct. 84, 193 L. Ed. 2d 73 (2015). Rather, the parties remain free to argue what, if any, inferences should be drawn from the evidence, and "it is the province of the jury to sort through any ambiguity in the evidence in order to determine whether [such evidence] warrants the inference that [the defendant] possessed a guilty conscience." (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 672, 31 A.3d 1012 (2011).

The consciousness of guilt instruction also "has a long history of precedent in this state." *State* v. *Jones*, supra, 234 Conn. 355. Such instructions have appeared in Connecticut case law for well over a century, with references dating back as early as 1894. See, e.g., *State* v. *Rome*, 64 Conn. 329, 336, 30 A. 57 (1894) ("[i]s his silence the stupidity of intoxication, or is it the silence of conscious guilt" (internal quotation marks omitted)). Prosecutors in this state regularly seek such instructions in the course of prosecuting their criminal cases.[14] See, e.g., *State*

---

[14] Instruction 2.6-3 of the Connecticut Criminal Jury Instructions contains the following instructions on consciousness of guilt:

v. *McClain*, supra, 324 Conn. 818–19 (consciousness of guilt instruction "ordinarily is sought by the state and opposed by the defendant"). As we have explained, whether to give a consciousness of guilt instruction is "left to the sound discretion of the trial court." (Internal quotation marks omitted.) Id., 820.

Whether a trial court should give a particular instruction rests on a variety of considerations, including, most notably, the core purpose of jury instructions—to assist the jury in understanding the governing legal principles and its role in determining the defendant's guilt or innocence. See, e.g., *State* v. *Bellamy*, 323 Conn. 400, 429, 147 A.3d 655 (2016). We have made clear, however, that jury instructions are not intended to unduly emphasize particular evidence or to suggest how that evidence should be weighed. See, e.g., *State* v. *Mebane*, 350 Conn. 483, 495–96, 325 A.3d 168 (2024).

"In any criminal trial it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense may have been influenced by the criminal act; that is, the conduct or statements show a consciousness of guilt.

"[<*Include if appropriate*:> For example,

"flight, when unexplained, may indicate consciousness of guilt if the facts and the circumstances support it.

"a persppon's possession of or attempt to conceal anything acquired through the crime may tend to show a consciousness of guilt.

"a person's false statements as to (his/her) whereabouts at the time of the offense may tend to show a consciousness of guilt.]

"Such (acts/statements) do not, however, raise a presumption of guilt. If you find the evidence proved and also find that the (acts/statements) were influenced by the criminal act and not by any other reason, you may, but are not required to, infer from this evidence that the defendant was acting from a guilty conscience.

"The state claims that the following conduct is evidence of consciousness of guilt: <*describe specific evidence*>.

"It is up to you as judges of the facts to decide whether the defendant's (acts/statements), if proved, reflect a consciousness of guilt and to consider such in your deliberations in conformity with these instructions." (Emphasis in original; footnotes omitted.) Connecticut Criminal Jury Instructions 2.6-3, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited July 21, 2026).

When deciding whether to give a consciousness of guilt instruction, a trial court must balance the need for the instruction against the potential risks associated with giving it. Any time a trial court singles out a particular piece of evidence in its instructions or identifies a specific inference that may be drawn from that evidence, there is some risk that the instruction will elevate that evidence or inference to the derogation of others. See, e.g., *State* v. *Hernandez*, 218 Conn. 458, 462, 590 A.2d 112 (1991) ("[t]he influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling" (internal quotation marks omitted)). Accordingly, although such evidence may be admissible as a matter of evidentiary law, the decision to provide a focused instruction on consciousness of guilt presents a distinct and more sensitive inquiry. The court must consider not only whether the evidence supports the inference the state urges, but also whether a tailored instruction will aid the jury beyond what counsels' arguments and the court's general evidentiary instructions already provide. The mere fact that consciousness of guilt evidence has been admitted does not, without more, establish that an instruction on that evidence is warranted.

When the prosecutor requests such an instruction over the defense's objection, the trial court should require the prosecutor to explain why the instruction is necessary—that is, why the jury cannot, despite the court's general instructions on circumstantial evidence and reasonable inferences, be expected to evaluate the consciousness of guilt evidence and draw the appropriate inferences without the court's express guidance. That inquiry is not merely procedural. Courts possess no special expertise in the interpretation of human behavior, and juries are, as a general matter, fully capable of assessing post-crime conduct and weighing the competing explanations for it without judicial prompting. Consequently, when the prosecutor cannot demonstrate that a specific consciousness of guilt instruction is necessary, the added

instruction may do more to distort the jury's deliberative process than to assist it and should not be given.[15]

When, on the other hand, the defense requests a consciousness of guilt instruction or does not object to one—for example, to ensure that the jury is told that there may be alternative explanations, consistent with innocence, for a defendant's conduct or statements—the calculus changes. In that circumstance, the instruction may serve a protective function, and we see no reason for the court not to give it.

If a trial court determines that a consciousness of guilt instruction is warranted, it should ensure that the instruction is neutral and balanced in order to reduce the risk of any improper influence on the jury. The CCDLA, as amicus curiae, argues that we should rewrite Connecticut's consciousness of guilt instruction.[16] Although we decline to prescribe a model instruction for all circumstances, we observe that the Judicial Branch's model consciousness of guilt instruction, as currently drafted, is not entirely balanced. See footnote 14 of this opinion. For example, the instruction provides space for the court to recite the state's position as to what evidence it claims reflects consciousness of guilt but leaves no corresponding space for the defendant's position.[17] The instruction

---

[15]During oral argument before this court, counsel for the state struggled to explain why such an instruction was necessary in this case or more generally, offering only broad claims that it aids the jury and provides guidance. Conclusory assertions that a consciousness of guilt instruction will aid the jury in its role as fact finder are insufficient to justify giving the instruction.

[16]The language used in the model jury instructions found on the Judicial Branch's website is "not binding on this court." (Internal quotation marks omitted.) *Snell* v. *Norwalk Yellow Cab, Inc.*, 332 Conn. 720, 762, 212 A.3d 646 (2019). See generally Connecticut Criminal Jury Instructions, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited July 21, 2026). We have cautioned that model instructions "are intended as a guide only, and that their publication is no guarantee of their adequacy." (Internal quotation marks omitted.) *State* v. *Gomes*, 337 Conn. 826, 853 n.19, 256 A.3d 131 (2021).

[17]The state, relying on our decision in *State* v. *Scott*, supra, 270 Conn. 106–107, asserts throughout its brief that this court has described the model consciousness of guilt instructions as " 'balanced.' " The state's

also should more clearly convey that a defendant's post-crime conduct or statement may not necessarily reflect a consciousness of guilt as to the specific crime charged and should include clarifying language that advises the jury that feelings of guilt, which are present in many innocent people, do not necessarily reflect actual guilt of a crime and that consciousness of guilt evidence, standing alone, is insufficient to prove guilt with respect to the charged offenses.

CCDLA also points out that the model instruction 2.6-3 states that " 'flight, *when unexplained*, may indicate consciousness of guilt' . . . ." **(**Emphasis added.**)** It argues that the italicized language "puts an unfair burden on defendants of color to testify to explain their reasons for flight, when their motivation to flee was related to systemic racism." This court itself has recognized that "[t]here are a number of legitimate reasons why a law-abiding citizen may not desire to remain on the scene when the police appear, especially in a dangerous neighborhood where police-citizen relations may be strained." *State* v. *Edmonds*, 323 Conn. 34, 73, 145 A.3d 861 (2016). The state does not oppose deleting that language in the model instruction, and we see no reason for the committee overseeing the promulgation of those instructions not to do so.

Finally, trial courts should also be mindful of the label or heading they assign to the instruction, both in their oral delivery and in the written charge provided to the jury. As the defendant correctly notes, the first thing

assertion, however, overlooks an essential detail of that case. In *Scott*, we said that the instruction was, in fact, balanced because the trial court's charge emphasized the defendant's explanation for his flight to Colorado and expressly admonished the jury not to infer consciousness of guilt if it found that the defendant had traveled there to comply with his military obligations rather than to evade questioning or arrest. Id. Accordingly, if a trial court decides to give a consciousness of guilt instruction identifying evidence relied on by the state, it should also inquire whether the defense requests a corresponding instruction that such conduct may admit of innocent explanations and, if so, whether the defense wishes the court to identify evidence supporting those alternative explanations.

jurors often encounter when following along with the court's written instructions is the title of the section—frequently "Consciousness of Guilt"—typically set off in bold, capital letters, underlining, or some combination thereof. In the present case, for example, the heading appeared in bold. Because such a label can subtly favor the state by framing the evidence in a manner that presupposes the very inference the jury is being asked to consider, a trial court should avoid using it. In the limited circumstances previously discussed in which a consciousness of guilt instruction is proper, the court should instruct the jury on the relevant principles without employing a label orally or in writing that adopts the state's characterization of the evidence.

In fact, the instruction can be given without using the phrase "consciousness of guilt" at all.[18] Using the

[18]We observe that our courts have often treated the phrases "consciousness of guilt" and "guilty conscience" as synonymous or interchangeable. See, e.g., *State* v. *Coccomo*, supra, 302 Conn. 672. They are not. "Guilty conscience" generally refers to a person's internal, subjective mental or emotional state, i.e., a feeling or awareness of having done something wrong. See, e.g., Black's Law Dictionary (12th Ed. 2024) p. 381 (defining "conscience" as "[t]he moral sense of right or wrong; esp[ecially], a moral sense applied to one's own judgment and actions" and, "[i]n law, the moral rule that requires justice and honest dealings between people"); Merriam-Webster's Collegiate Dictionary (12th Ed. 2026) p. 353 (defining "conscience" as "the sense or consciousness of the moral goodness or blameworthiness of one's own conduct, intentions, or character together with a feeling of obligation to do right or be good"). By contrast, "consciousness of guilt" generally refers to an inference that may be drawn from a defendant's conduct or statements—such as flight, false statements, or concealment of evidence—suggesting awareness of wrongdoing or an effort to avoid responsibility or consequences. See Black's Law Dictionary, supra, p. 381 (defining "consciousness of guilt" as "[t]he awareness of an accused that he or she has engaged in blameworthy conduct, usu[ally] as demonstrated by evidence that the accused has tried to avoid the consequences of a crime, as by lying before or during the trial or by fleeing before or after arrest").

The consciousness of guilt doctrine does not depend on proof of a defendant's internal emotional state. It instead permits the jury to draw inferences from the defendant's conduct or statements. Although both concepts may reflect the same general idea that certain behavior may indicate an awareness of wrongdoing, a "guilty conscience" suggests moral culpability (and may imply remorse), whereas consciousness of

instruction given in the present case as an example, the court could have deleted the consciousness of guilt title and modified the charge along the following lines: "In any criminal trial, it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense, may have been influenced by the criminal act, that is, that the defendant's conduct or statements show an effort to evade detection or avoid responsibility for the alleged crime. For example, a person's false statements as to his or her whereabouts at the time of the offense may tend to show that the defendant was trying to evade detection or avoid responsibility for the alleged crime." Similar language describing the defendant's alleged efforts to evade detection or avoid responsibility for the charged conduct could be substituted for the phrase "consciousness of guilt" throughout the instruction. Such revisions offer at least two advantages. First, as previously noted, our case law and the model instructions sometimes use the phrases "consciousness of guilt" and "guilty conscience" interchangeably. Although they sound similar, they reflect distinct concepts. Eliminating the phrase "consciousness of guilt" from jury instructions would therefore reduce the risk that jurors conflate the two. Second, evidence of a defendant's consciousness of guilt is probative only to the extent that it supports an inference that the defendant believed he was guilty of the charged offense. Framing the instruction instead in terms of the inference the state asks the jury to draw—that the defendant acted to avoid

guilt evidence is more narrowly concerned with efforts to avoid legal culpability or detection. A defendant may be fully aware of his culpability for a crime while feeling no remorse. Conversely, a person may experience a sense of guilt in connection with a crime for which he bears no legal responsibility, for example, when he knows another intends to commit an offense but fails to intervene. Importantly, consciousness of guilt evidence is circumstantial and does not, by itself, establish any element of the charged offense. Conflating it with proof of an actual "guilty conscience" risks overstating its probative value and confusing the jury. As noted, feelings of guilt, which many innocent people experience, do not necessarily reflect actual guilt. Accordingly, to the extent a consciousness of guilt instruction is given, it should also avoid reference to a "guilty conscience."

detection or responsibility—more precisely conveys the asserted relevance of the evidence.

In sum, although we decline the defendant's invitation to categorically eliminate consciousness of guilt instructions, we emphasize that the decision to admit consciousness of guilt evidence is distinct from the decision to highlight it through a specific jury instruction. In exercising their discretion, trial courts should undertake a careful, case-specific assessment of whether a consciousness of guilt instruction is warranted and, if so, the appropriate form it should take, following the considerations that we set forth in this opinion.

The judgment is affirmed.

In this opinion MULLINS, C. J., and ALEXANDER and BRIGHT, Js., concurred.